IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 2, 2025

**IN RE TARON H.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT276364      Sheila Calloway, Judge**

_____

**No. M2024-01260-COA-R3-PT**

_____

This is a termination of parental rights appeal. The trial court found that four statutory grounds existed to terminate Mother's and Father's parental rights to the minor child and that termination of parental rights would be in the child's best interest. Father has appealed. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

VALERIE L. SMITH, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Taron H., Sr.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.      Factual and Procedural Background**

The child at issue, Taron H.[1] (the "Child"), was born in January 2020. The Department of Children's Services ("DCS") was soon notified that the Child's urine was positive for THC. When DCS spoke with Jazmine M. ("Mother"), she admitted to smoking THC while pregnant with the Child. Mother alleged that Taron H., Sr. ("Father") was

_____

[1] In cases involving the potential termination of parental rights, it is the policy of this Court to abbreviate the full names of the children and other parties to protect their identities.

physically abusive. The Child was placed in temporary state custody on September 16, 2021, pursuant to an emergency protective order that alleged lack of supervision, substance abuse, medical neglect, and domestic violence. The Child was adjudicated dependent and neglected pursuant to Tennessee Code Annotated sections 37-1-102(b)(13)(F) and (G) by the Davidson County Juvenile Court (the "trial court") on August 8, 2022. In part, this determination was based on domestic violence by Father against Mother and Father's resulting incarceration. The Child has been in foster care continuously since removal into state custody in September 2021.

On May 2, 2023, DCS filed a Petition to Terminate Parental Rights (the "Petition") against Mother and Father. The Petition was heard on June 26, 2024. Father was released from jail approximately one week before the hearing. Mother failed to appear or participate in the hearing.[2] DCS alleged that the grounds to terminate parental rights included Father's failure to provide financial support for the Child, Father's failure to remedy the conditions that led to the Child's removal from the home, and Father's failure to manifest a willingness or ability to care for the Child such that returning the Child to Father would pose a risk of substantial harm to the Child's welfare. DCS also alleged it was in the best interests of the Child for the Petition to be granted. On July 29, 2024, the trial court entered an order terminating Mother and Father's parental rights. Father timely filed a Notice of Appeal in this Court on August 20, 2024.

## II.    Issues Presented

As set forth in his brief, Father presents the following issues for review on appeal:

1. Whether the trial court erred when it found by clear and convincing evidence that Father abandoned his child by failing to pay support pursuant to T.C.A. § 36-1-113(g) and T.C.A. § 36-1-102(A)(1), T.C.A. § 36-1-102(1)(C), and T.C.A. § 36-1-102(1)(E)?

2. Whether the trial court erred when it found by clear and convincing evidence that the Child has been removed from Father's home for six (6) months and the conditions which led to the Child's removal still persist and there is little likelihood that these conditions can be remedied at an early date pursuant to T.C.A. § 36-1-113(g)(3)?

3. Whether the trial court erred when it found by clear and convincing evidence that Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child and placing him in the legal and physical custody of the Father would pose a risk of substantial harm to the

---

[2] Due to Mother's lack of involvement in the termination hearing and appeal, our discussion will center around Father's actions rather than Mother's to the extent possible.

physical or psychological welfare of the Child pursuant to T.C.A. § 36-1-113(g)(14)?

4. Whether the trial court erred when it found that termination of Father's parental rights was in the best interest of the Child pursuant to T.C.A. § 36-1-113(i)?

Father has also raised as an issue the trial court's determination that he abandoned the Child by failing to provide a suitable home. DCS concedes that the record on appeal cannot establish what efforts were made during the relevant four-month time frame. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii). In the interest of brevity, we summarily reverse as to this ground without taxing the length of this Opinion with unnecessary analysis. *See, e.g.*, *In re Nakayia S.*, No. M2017-0164-COA-R3-PT, 2018 WL 4462651, at *3 (Tenn. Ct. App. Sept. 18, 2018) (holding that two grounds for termination conceded by DCS on appeal had been waived and were summarily reversed).

## III. Standard of Review

"Parents have a fundamental constitutional interest in the care and custody of their children," which is guaranteed under both the United States and Tennessee constitutions. *In re Connor B.*, 603 S.W.3d 733, 788 (Tenn. Ct. App. 2020) (quoting *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2022)). This right is not absolute, however, and may be terminated if a court finds that one of the statutory grounds for termination exists and that termination is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c) (2022); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). Grounds and a best interest determination for the termination of parental rights must be found by clear and convincing evidence, which "serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Clear and convincing evidence enables the factfinder to form a firm belief or conviction regarding the truth of the facts . . . and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted).

In termination cases, the standard of appellate review differs slightly from our typical review under Rule 13 of the Tennessee Rules of Appellate Procedure. The Tennessee Supreme Court has explained it as follows:

To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn.

- 3 -

2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

### IV. Statutory Grounds for Termination of Father's Parental Rights

1. Abandonment – Failure to Support
   Parental rights may be terminated for abandonment. Tenn. Code Ann. § 36-1-113(g)(1). Relevant to this case, the term "abandonment" includes:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

*Id.* § 36-1-102(1)(A)(i).

The totality of Father's argument on appeal on this ground for termination is that the trial court "used the incorrect time period to examine the Father's failure to pay child support, therefore, the termination of Father's parental rights based on abandonment should

be reversed." In its Final Order, the trial court examined this ground and incorrectly articulated that the relevant period for determining the parents' failure to support was the "three" months preceding the Petition being filed. As DCS concedes, the trial court did mistakenly set forth the current definition of abandonment, which looks to the three months preceding the filing of a termination petition for children under four years of age. *See id.* § 36-1-102(1)(A)(i)(b) (West 2024). Although the trial court stated in one sentence that it was only looking back at the three months preceding the filing of the Petition, the trial court also found that "the Department's termination was filed on May 2, 2023, such that the four months immediately preceding the filing of the same began on was January 2, 2023, and ended on May 2, 2023." We further note, and DCS concedes in its brief, that the trial court improperly included the date on which the petition to terminate was filed in the calculation of the four-month period for failure to support. *See In re Arianna B.*, 618 S.W.3d 47, 64 (Tenn. Ct. App. 2020). The relevant four-month period in this case was January 1, 2023, through May 2, 2023. We conclude, however, that these errors are harmless in this case due to Father's failure to make any child support payments during the relevant timeframe or at any time since the Child was removed into DCS custody. While the court stated in one sentence that it was only looking back three months before the petition was filed, the record reflects that the court did in fact make sufficient findings for the relevant four-month period for the consideration of whether Father had abandoned the Child for failure to support. *See In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019) (holding "that a miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period.")

The court further determined that Father was "able-bodied and capable of working and earning enough to support himself as well as paying child support." The trial court found that Father was aware of the consequences that would result from his failure to support the Child "because the Juvenile Court explained said requirements and the consequences of [his] failure to follow them on November 15, 2021, and August 8, 2022." Moreover, on September 19, 2022, Father signed the Criteria and Procedures for Termination of Parental Rights, which detailed Father's responsibility to pay support and the consequences of his failure to do so. As a result, the trial court found that DCS had proven the ground of abandonment due to Father's failure to support by clear and convincing evidence.

We agree and hold that clear and convincing evidence supports the trial court's finding that Father has abandoned the Child by failure to support.

2. Persistent Conditions
   Courts may terminate a parent's rights for persistent conditions when:

   (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court

- 5 -

order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

*Id.* § 36-1-113(g)(3). A court must determine that each of these three factors existed and that the child had been removed from the home by court order for six months in order to terminate parental rights based on this ground.

As the trial court noted, the conditions that led to the Child's removal from the home were Mother's substance abuse, incidents of domestic violence between Mother and Father, Mother's mental health, and Father's incarceration, which prevented him from caring for the Child. At the time of the hearing, the trial court found that these conditions, which led to the removal of the Child from the home, persisted. Mother and Father continued to engage in drug and alcohol abuse. The Child has not been in their custody for more than three years. Mother was in violation of her probation, and there was a warrant out for her arrest. Father had been released from jail just one week prior to the hearing and did not have stable housing or employment. Father also tested positive at the hearing for illegal substances – cocaine and THC. He was released from jail on Friday, June 21, 2024, and tested positive for cocaine and THC on Wednesday, June 26, 2024.

Ultimately, the trial court determined that Father had not remedied the conditions that required the Child to be removed from the home initially and returning the Child to the parents "would subject the [C]hild to further abuse or neglect due to these ongoing concerns." The trial court further found that "[t]here is little chance that those conditions will be remedied soon so that the [C]hild can be returned safely to the home." According

to the trial court, "[c]ontinuation of the parent/child relationship greatly diminishes the [C]hild's chances of being placed into a safe, stable, and permanent home," and "[i]n contrast to the instability and concerns with the parents, the [C]hild is in a safe and stable foster home where it is hoped he can receive permanency at an early date." Thus, the trial court held, "DCS has proven, by clear and convincing evidence, the ground of persistent conditions against [Mother and Father]."

On appeal, Father concedes that the Child had been removed from his custody for more than six months by the trial court's order in the underlying dependency and neglect proceedings. He argues, however, that he is no longer involved with Mother, which "mitigates" any of the court's domestic violence concerns. In his brief, Father suggests that he and the Child could temporarily live with the Child's paternal grandmother. Further, Father asserts that he is seeking employment and "plans" to return to work as a cook "soon." In sum, Father argues that the proof does not show that the conditions that led to the removal of the Child would not be remedied at an early date.

As DCS points out in its brief, however, Father's position fails to account for the several years after the Child was removed during which he did not make progress toward remedying the conditions that led to the removal. At the time of the hearing, it had only been one week since he was released from incarceration when Father again tested positive for illicit substances. In the time since the Child's removal, Father has been in and out of jail several times on charges related to illicit drugs, vandalism, probation violations, assault, domestic assault, and violations of restraining orders. Moreover, at the termination hearing, Father testified that it might take some time for the Child to be able to move in with him and the grandmother, and there was a suggestion that the Child simply remain in foster care or live with a relative while Father continued "getting [him]self together." Although Father proposed that the solution to his domestic violence problems was to refrain from interacting with Mother, there was testimony at the hearing that Mother and Father had already been in contact during the one week since Father was released from jail.

DCS proved the ground of persistent conditions by clear and convincing evidence.

3. Failure to Assume Legal and Physical Custody or Financial Responsibility

The trial court also held that DCS had proven that Father had failed to manifest the willingness or ability to parent the Child. Parental rights may be terminated when:

> A parent has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . . .

*Id.* § 36-1-113(g)(14). This ground contains two elements that must both be proven by clear

and convincing evidence. The first element "places a conjunctive obligation . . . on a parent to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (2020).

On appeal, Father asserts that he has "expressed his willingness to get his life together, so [the Child] could be placed in his custody." Therefore, Father reasons, his expression of willingness to parent along with his "release from incarceration and improving circumstances" show that the trial court erred in finding termination based on this ground. We disagree. This ground is satisfied if a petitioner proves by clear and convincing evidence that a parent "has failed to manifest either ability or willingness." *Id.* (emphasis in original). Father's assertions of willingness and desire to parent the Child are not sufficient alone, as this Court "look[s] for more than mere words" when making this determination. *In re Jonathan M.*, No E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). Father's willingness to parent could have been demonstrated "by attempting to overcome the obstacles that prevent [him] from assuming custody or financial responsibility for the [C]hild." *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019). Father has failed to make any compelling argument that the trial court's finding should be reversed.

Although Father's brief only mentions the second element of this ground tangentially, this second prong requires proof that returning the [C]hild to the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 162930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The trial court went into substantial detail in its findings regarding why termination on this ground was proper. The trial court found that Father made no efforts to have the Child placed in his care and his pattern of behaviors that would make it unsafe to assume legal and physical custody of the [C]hild continued. Further, the trial court stated that if the Child were to be placed with Father, it would "pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." In support of this decision, the trial court again relied on Father's lack of stable housing and employment, as well as Father's continued use of illicit substances. The trial court further noted that the Child in this case has "specialized medical needs which require his caregiver to be stable, safe, and knowledgeable about his needs." Nevertheless, the trial court found that Father made "no efforts to educate [himself] about the child's medical needs and cannot even provide for the [C]hild's basic needs, much less his specialized needs."

We agree with the trial court that the evidence clearly and convincingly establishes that Father failed to manifest an ability and willingness to care for the Child.

## V.     Best Interests of the Child

After finding that at least one ground exists to terminate parental rights, courts must

then analyze whether it is in the child's best interest for termination to be granted. Tennessee Code Annotated section 36-1-113(i) contains a nonexclusive list of best interest factors for a court to consider. The factors "may include, but are not limited to":

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

- 9 -

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." *Id.* § 36-1-113(i)(3).

In this case, the trial court found the following factors applicable: Tennessee Code

Annotated sections 36-1-113(i)(A), (B), (C), (D), (E), (H), (I), (J), (K), (L), (M), (O), (P), (Q), and (S). We begin by examining the factors relevant to the Child's emotional needs. *See id.* §§ 36-1-113(i)(A), (B), (D), (E), (H), and (I).  It is uncontroverted that DCS has been involved in the Child's life since days after his birth. The Child has been in DCS custody since August 2020, and after a failed trial home placement, the Child has been in foster care since September 2021.  The trial court found that the Child has a "critical need for stability and continuity of placement."  Additionally, the trial court found that Father did not have a healthy and secure attachment with the Child and that there was no reasonable expectation that one could be created.  While Father failed to visit or support the Child, a healthy parental attachment developed with another in his absence.  The trial court found that the Child was "thriving in the foster home and removal from that home would be detrimental to his continued progress."  The Child even referred to his foster parents as "mom" and "dad."  Furthermore, the Child had no "emotionally significant relationships" with persons other than his current caregivers, and termination would not affect his ability to access information about his heritage.  The trial court found that these factors weigh in favor of termination. We agree.

We next consider the factors related to whether Father can meet the needs of the Child.  *See id.* §§ 36-1-113(i)(C), (J), (K), (L), (M), (O), (P), (Q), and (S).  Father has never provided for the Child's basic needs, including providing more than token financial support, or taken steps to learn how to meet the specialized needs of the Child.  Moreover, Father's history of criminal activity and continued use of illicit substances weighed in favor of termination.  The trial court found that, despite DCS's reasonable efforts to assist Father in making the changes he professed to want to make in his life, he had not taken advantage of the programs offered to him.  Father had never provided a safe and stable environment for the Child, and he had shown no "sense of urgency in seeking custody of the [C]hild and addressing the circumstance, conduct or conditions that made an award of custody unsafe and not in the [C]hild's best interest." We agree with the trial court that these factors also weigh in favor of termination.

On appeal, Father asserts that his "limited contact" with the Child has been due to Father's incarceration, but Father is "now out of jail and very much wants an opportunity to have custody of his son" and has "expressed his desire to get his life together for his son."  Further, Father notes that he has been released from incarceration, and he alleges that he has room for the Child to stay with him.  Father points to his completion of "some" of the services offered to him throughout the custodial episode, and he testified that he would no longer do drugs and that domestic violence will no longer be an issue. However, the proof in the record – not just Father's mere assertions – shows that nearly every one of the best interest factors weigh in favor of termination in this case.

After considering the relevant statutory factors and assessing their weight, the trial court determined that DCS had proven by clear and convincing evidence that it was in the best interest of the Child for Father's parental rights to be terminated. Upon our own review

- 11 -

of the record, we determine that the weight of the relevant factors provides clear and convincing evidence that termination is in the Child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

## VI.    Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.  Costs are taxed to the Appellant, Taron H., Sr., for which execution may issue if necessary.

s/ Valerie L. Smith
VALERIE L. SMITH, JUDGE
